UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID LEE GREEN,

     Petitioner,

v.                                **Case No. 8:13-cv-837-T-35TGW**

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.
_____/

## O R D E R

    This cause is before the Court on David Lee Green's counseled, timely-filed petition for the writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1) Upon consideration of the petition, the memorandum (Doc. 2), the response (Doc. 30), and the reply (Doc. 37), and in accordance with the *Rules Governing Section 2254 Cases in the United States District Courts*, it is **ORDERED** that the petition is **DENIED**:

## PROCEDURAL HISTORY

    Green was convicted after a jury trial of solicitation to commit first degree murder. (Doc. 32 Ex. 29 at 53) The state trial court sentenced Green to 30 years in prison. (Doc. 32 Ex. 29 at 55-59) The state appellate court *per curiam* affirmed the conviction and sentence. (Doc. 12 Ex. 5) The state court denied Green's motion for postconviction relief, filed under Florida Rule of Criminal Procedure 3.850. (Doc. 32 Ex. 20 at 34-78; Ex. 21 at 239-41, 278-82, 355-56) The state appellate court initially reversed the denial of Green's claim that trial counsel was ineffective in not presenting an entrapment defense because the postconviction court did not attach to its order portions of the record that conclusively refuted the claim.

1

*Green v. State*, 34 So.3d 783 (Fla. 2d DCA 2010). The state appellate court affirmed the denial of relief in all other respects. *Id*. On remand, the state postconviction court conducted an evidentiary hearing on the claim of ineffective assistance of counsel for not raising entrapment. Following the hearing, the court again denied Green's claim. (Doc. 32 Ex. 28 at 297-310) The state appellate court *per curiam* affirmed the order of denial. (Doc. 32 Ex. 37)

Green's § 2254 petition was initially dismissed as time barred. (Doc. 16) Based on a change in the law while the subsequent appeal was pending, however, Green's § 2254 petition was determined to be timely. (Docs. 23, 25) This Order reviews the petition on its merits.

## FACTUAL BACKGROUND

## I.   Evidence Presented At Trial; Green's Defense

Petitioner David Lee Green and Ginger Green ("Ginger") married in August 1999. Green, who had at one point worked selling life insurance, purchased a $50,000 life insurance policy on Ginger. Green was the beneficiary of the policy. Ginger moved out in February 2000 and filed for divorce. The divorce was finalized in June 2000. During the divorce proceedings, Green was ordered to cancel the life insurance policy. Upon leaving the courtroom after the final divorce hearing, Green stated that he was not going to cancel the policy and that he was going to collect on it. Green did not cancel the policy.

In July 2000, Green's acquaintance Michael Bemis called Green from jail, asking for assistance. Green paid Bemis's bond. According to Bemis, when Bemis asked Green how he could pay Green back, Green said that he had an insurance contract job for Bemis. Bemis said that Green asked him to kill Ginger and told Bemis that he would receive half of the life insurance proceeds. Bemis told Green that he would think about it.

2

Bemis was arrested again in September 2000. On September 30, 2000, while incarcerated, he told a detective that Green had asked him to kill Ginger. On October 3, 2000, after Bemis was released from jail, he went to Green's house wearing a wire. Law enforcement officers who were positioned nearby, including Detective Wayne Durrance, listened to and recorded a conversation between Green and Bemis. The two discussed various ways in which Bemis could kill Ginger. Green told Bemis where Ginger lived, where she worked and went to school, and where she went on Friday nights. Green showed Bemis photographs of Ginger and informed Bemis that he could provide more photographs and a work schedule. Green and Bemis also discussed obtaining a gun; Green indicated that he could get one from a person named Gene. Green was arrested the next day, October 4, 2000.

Green's defense was that he was only joking when he talked to Bemis about killing Ginger. Therefore, he argued, the State could not prove guilt beyond a reasonable doubt.[1] Green and Bemis both testified that the two would sometimes play games of "What If". Green explained that this game was "a defining of the What Ifs, you know. What if you won [a] million dollars. What if we happen to be walking down the street and an armored car guy

---

[1] The jury was instructed (Doc. 32 Ex. 29 at 36) (emphasis added):

Before you can find the defendant guilty of Criminal Solicitation, the State must prove the following two elements beyond a reasonable doubt:

1. David Lee Green solicited Michael Bemis to commit Murder in the First Degree (Premeditated).

2. During the solicitation, David Lee Green encouraged, hired, or requested Michael Bemis to engage in specific conduct, which would constitute the commission of Murder in the First Degree.
. . .

**To "solicit" means to ask earnestly or to try to induce the person solicited to do the thing solicited.**

3

trips or something like that." (Doc. 32 Ex. 31 at 230) Green testified that he and Bemis would discuss committing crimes but would not actually do so. Green contended that he made the recorded statements in a game of "What If" and did not genuinely mean them.

Bemis acknowledged his deposition testimony that it was "maybe 50/50" whether Green was serious during their conversation. (Doc. 32 Ex. 30 at 167) Bemis also testified that Green had a "strange, sick" sense of humor, and that they "BS'd around" about things that they never actually did, including criminal conduct. (Doc. 32 Ex. 30 at 163-65) In support of his assertion that the conversation was not serious, Green also noted that the discussion was rambling and addressed numerous topics other than killing Ginger.

## II.    The Recorded Conversation

A recording of the October 3, 2000 conversation between Bemis and Green was played at trial. The transcript of the recording spans approximately 44 pages. Excerpts of the conversation, along with summaries of other portions of the conversation, are set out below.

Near the beginning of the recording, Bemis and Green stated (Doc. 32 Ex. 30 at 82-91):

MR. BEMIS: [ ] So how much you figure I owe you now?

MR. GREEN: What do you feel, $300.

MR. BEMIS: $300. You're going to let me work that off, though? You still want me to do that job?

MR. GREEN: Which one?

MR. BEMIS: The ex-wife thing.

MR. GREEN: Must be something pretty freaky.

MR. BEMIS: Well, you're serious about it, man, I am, too. I need money bad. How much you say that policy is?

MR. GREEN: Fifty.

MR. BEMIS: And I get half, 25 big ones, minus the $300. (Laughing) What's that, $24,000, ah, $700. I could still live on that. Goddamn right.

MR. GREEN: You could get a - - somewhere.

MR. BEMIS: Huh?

MR. GREEN: You could get a - - somewhere.

MR. BEMIS: Shit, no. Have to move, fucking - - I'm staying at a goddamn, ah, what is that little dive. My girlfriend's got a fucking little trailer we're trying to get up out of right now. I'm fucking strapped, man. I'm still driving that car you loaned me. It's about to go out. Got fix [sic] her Mustang. I just ain't got bread for shit, man. And I have my habit, too, you know. You thought about how you want it done?

MR. GREEN: I don't care how it's done.

MR. BEMIS: As long as that bitch is dead, you know. (burps) Well, I thought I'd give a friendly overdose. $100 worth of dope. It looks like an accident, you know what I'm saying? Put her hand around the syringe, leave the fingerprints on the syringe. It looks like she did it herself. What do you think?

MR. GREEN: She doesn't do any.

MR. BEMIS: Well, that doesn't matter, long as, you know, who's going to know that? It will look like - - don't it pay out double if it's an accident?

MR. GREEN: Ah.

MR. BEMIS: Straight fifty grand?

MR. GREEN: Yeah.

MR. BEMIS: Oh, well. You still got that policy on me?

MR. GREEN: No, I don't think so.

MR. BEMIS: You don't think so?

MR. GREEN: Uh-uh.

MR. BEMIS: I'm worried that I did [sic] the job, instead of giving me my twenty-five grand, you just off my ass. Then you'll have two policies.

MR. GREEN: Yeah, there you go.

MR. BEMIS: (Laughing) I've been wondering about that.

MR. GREEN: No, I don't have - - I don't have that anymore. The only three I've got is mine, [Green's daughter's], Cathy's,[2] hers.

MR. BEMIS: What's her name? I ain't even ever met the bitch.

MR. GREEN: Ginger.

MR. BEMIS: Got a picture of her? She's kind of cute, man. Is this the one that your old man hates?

MR. GREEN: Yeah.

MR. BEMIS: Said that she's a big fat girl.

MR. GREEN: No.

MR. BEMIS: Said that she's a witch. Is this the only picture you got?

MR. GREEN: No, I got more of them.

MR. BEMIS: I'm going to need a picture, man. Something kind of recent if you got one.

MR. GREEN: Oh, I got plenty of those.

MR. BEMIS: And a work schedule. What time she, you know, she gets off. Where she works at and shit.

MR. GREEN: FMU.

MR. BEMIS: FMU.

. . .

MR. BEMIS: You gonna loan me the money to get the dope with, ain't you?

MR. GREEN: (Laughing)

---

[2] "Cathy" appears to be the mother of Green's child.

MR. BEMIS: I mean, I ain't go[t] no money to buy no fucking dope to off her ass, you know what I'm saying? Just tell me when. You know, get a work schedule. I'd like to do it as soon as possible. You say it takes four weeks to get paid.

MR. GREEN: Yeah, you gotta get the, ah, death certificate and take it and turn it in.

MR. BEMIS: Then they mail you a check or something?

MR. GREEN: They ah, they'll bring it to myself. Anything over $5,000 they bring to you.

MR. BEMIS: Can't trust the mail system. (Laughing)

MR. GREEN: (Laughing)

MR. BEMIS: Goddamn, can't trust the mail.

MR. GREEN: I know.

MR. BEMIS: I need that shit. What part of town does this girl live in, man?

MR. GREEN: Right down the road. Estates Del Sol.

MR. BEMIS: Estates Del Sol. So, she lives by herself?

MR. GREEN: She lives with her mom, dad.

MR. BEMIS: I was thinking, like, how I'd run into her, and actually, you know, meet her. You know what I'm saying? Use my southern charm. Get her to go out on a date with me without meeting the family or anybody, you know what I mean? Well, she just had a date with this guy.

MR. GREEN: She won't go out with you. I guarantee that one.
. . .

MR. BEMIS: You got a picture I can get. . . . I was hoping I could get a fucking picture and a work schedule, man, and get started on this mother fucking shit, man. I've been thinking about it for - - steady for about the last three weeks. How I could do it and not look like anything, you know what I mean? They'll find her in a fucking car or a motel room or something. And I'll - - it will just look like an OD.

MR. GREEN: There's a lot of different places and different ways. She goes to the auction on Friday nights on 301. Gandy's auction.

MR. BEMIS: That will be a good place to meet her then. No, man, I got to meet - - gotta meet this girl somehow, you know. Trust me, I thought, ah, pulling up beside her and snatching her ass into the car, you know what I mean?

But this is too many, ah, hero types, that fucking get involved these days, you know what I mean? I would prefer not to be seen with her at a place, where, you know, they find a dead chick and who was the last person she was with is always the first thing they want to know.

MR. GREEN: (Laughing)

MR. BEMIS: You know what I mean? And there is the thing where you got an insurance policy and what is the last - - where were you at? Well, you were at work, so you're fine. You know what I mean? But you know, they don't stop digging, man, unless it looks like an accident.

If it's an accident or an overdose - -

MR. GREEN: Depends on how many they had that month, too.

MR. BEMIS: What's that?

MR. GREEN: Depends on how many they had that month. (Laughing)

MR. BEMIS: That ain't no lie.

Bemis noticed some screwdrivers, and Green explained he bought them at an auction.

They continued (Doc. 32 Ex. 30 at 92-94):

MR. BEMIS: [ ] Tell you something else. You know what happens when you shove one of these into someone's ear? It's a nice clean death. . . . But that ain't how it's going to happen. I prefer to ram them full of some kick ass dope.

MR. GREEN: What happens - - (inaudible).

MR. BEMIS: She pukes a couple of times and bye bye. That way it's not cruel, you know what I mean?

MR. GREEN: You could just drive-by and shoot the bitch.

MR. BEMIS: Got the gun? (Inaudible) - - mine, man. Because to be honest with you, that's a good way, too. Drive-by and shoot her. They say that's the hardest way to get any evidence. It all stays in the car, you know what I mean? Except for the bullet and that's in her ass. And that gun's going off the bridge.

MR. GREEN: (Laughing)

MR. BEMIS: But I don't have a gun, but I'll damn sure use yours.

MR. GREEN: (Laughing) Mine's registered.

MR. BEMIS: Yeah, not them. They'd ask you for it, wouldn't they?

MR. GREEN: Yeah.

MR. BEMIS: Oh, shit.

MR. GREEN: I can get one, though.

MR. BEMIS: Well, I tell you what. Get a gun, I'd rather do it like that. That way I don't have to spend no time with her, you know what I mean?

MR. GREEN: I - - I could get one from Gene.

MR. BEMIS: A $25,000 bullet. (Laughing)

MR. GREEN: (Laughing) There's a lot of lunatics in this world.

Green and Bemis discussed and laughed at a news story about a person who had

solicited a police officer to commit murder. Then, they discussed topics such as fishing and

tools before talking about Ginger again (Doc. 32 Ex. 30 at 97-98):

MR. BEMIS: Cool. Ah, you don't have time to make out that - - get me a picture and get me a work schedule?

MR. GREEN: Yeah, I'll get a work schedule. She goes to college and she works at the same place.

MR. BEMIS: Oh, yeah?

MR. GREEN: She's there like 12 or 13 hours a day.

MR. BEMIS: So that's a good place to catch her coming out of then.

MR. GREEN: Yeah, the parking lot.

MR. BEMIS: And just cap off a couple of rounds and keep on trucking.

9

MR. GREEN: Joy killing.

MR. BEMIS: Joy killing? You must hate this bitch, man. Or is the just the money?

MR. GREEN: Combination.

MR. BEMIS: Combination? (Laughing) I hear you. It's strictly money for me. (Inaudible) And a drive-by would be even better. How long will it take you get a gun, man? If you want, I can come back and get the picture, the work schedule and the gun.

MR. GREEN: I'll see Gene this weekend.

Green and Bemis both indicated that they needed to leave, but also discussed cell phones, planes, and pilot's licenses. Their conversation then continued (Doc. 32 Ex. 30 at 105-09):

MR. BEMIS: [ ] What's Ginger's last name? Green?

MR. GREEN: Ah, Waymire now.

MR. BEMIS: Ya'll actually married there at one time?

MR. GREEN: Uh-hum.

. . .

MR. BEMIS: Well, hopefully, I can do this thing quick, because I need the money, bro. I need the money bad, bad, bad. Because I'm tired of worrying about every day life. Fucking getting, like you know, you compare it to robbing a bank. And I wouldn't get $25,000 out of a bank and I would get caught, you know what I mean?

. . .

MR. BEMIS: [ ] Hey, let me borrow a few bucks, man. And tell me when I can come back and I can get the rest of that shit together. A picture, a work schedule and a fucking gun.

MR. GREEN: Er - - ah.

MR. BEMIS: See, you're still friendly with her, so you can - -

MR. GREEN: Oh, hell no.

MR. BEMIS: No? How can you get her work schedule?

MR. GREEN: I can call every day.

MR. BEMIS: That's cool. I mean, it don't make a fuck to me as long as I know when - -

MR. GREEN: Just call every day and see if she's there.

MR. BEMIS: Right.

MR. GREEN: And, ah - -

MR. BEMIS: I just hate to shoot the wrong bitch, man. You know what I mean? Because I ain't going to be aiming for no knee. I'm going to be aiming for that chest and head area. Pump about six rounds in the bitch and make sure she's dead 'cause I can't afford no identification.

Do you want me to do it while you're at work, huh?

MR. GREEN: Don't worry about me. I'm always out with somebody who knows me.

MR. BEMIS: That's cool.

MR. GREEN: Best way is - - would be when she's a - - hell, for that thing, you could probably get her in her own goddamn yard.

MR. BEMIS: Yeah, but it looks like you know her, you know what I mean? Gotta look like a random shooting or something.

MR. GREEN: Yeah.

Green and Bemis discussed family photographs in the house and vacations that Green had taken. They discussed a photograph of Ginger and her current appearance, and Green indicated he would provide Bemis with larger photographs (Doc. 32 Ex. 30 at 117):

MR. BEMIS: Oh, okay. You don't want to part with none of those?

MR. GREEN: Oh, yeah, I will. I will get you a couple of real big ones to - -

MR. BEMIS: Ok. Yeah, if you could, man. Have me a work schedule and a picture of her and if I can get that gun. That way I'll have everything on me and all I have to do is ride over there and wait. I need the fucking money, brother. Bad. Bad. . . .

Bemis mentioned leaving Florida, and Green and Bemis talked about items around the house before deciding meet up again (Doc. 32 Ex. 30 at 119-20):

MR. BEMIS: [ ] Um, when's a good time to come back and get that shit from you?

MR. GREEN: Ah, come on Sunday.

At the conclusion of the recording, Green mentioned that he planned to go to Ybor on Saturday and try to get a woman to go out on a date with him, before reaffirming that Bemis should contact him over the weekend. (Doc. 32 Ex. 30 at 120-125)

## STANDARDS OF REVIEW

### I.     AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed the judgment and sentence, as well as the denial of Green's postconviction claims, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).

13

## II.   Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Green must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Green must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (stating that this doubly deferential standard of review "gives both the state court and the defense attorney the benefit of the doubt."). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination

14

was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## DISCUSSION

**Ground One**

Green contends that trial counsel was ineffective in failing to raise an entrapment defense. Under Florida law, a subjective entrapment defense may be available to a defendant who was induced by a government agent to commit an offense, and who lacked predisposition to commit the offense. § 777.201, Fla. Stat.; *State v. Henderson*, 955 So.2d 1193, 1194-95 (Fla. 4th DCA 2007).[3] "Predisposition . . . focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Jones v. State*, 114 So.3d 1123, 1126 (Fla. 1st DCA 2013) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). "The state may prove predisposition with evidence of 'the defendant's prior criminal activities, his reputation for such activities, reasonable suspicion of his involvement in such activity, or his ready acquiescence in the commission of the crime.'" *Id*. (quoting *State v. Casper*, 417 So.2d 263, 265 (Fla. 1st DCA 1982))).

Green contends that the recorded conversation supports an entrapment defense. Green argues that Bemis "appeared at Petitioner Green's door uninvited" and that Green did not know what Bemis was talking about when Bemis asked if Green was still interested in the "job." (Doc. 2 at 7) Green asserts that Bemis "continues throughout the tape to try to steer

---

[3] Florida law also recognizes objective entrapment, which involves egregious law enforcement conduct. *Jimenez v. State*, 993 So.2d 553, 555 (Fla. 2d DCA 2008). Objective entrapment is not at issue in this case.

the conversation back to killing the ex-wife" and "repeatedly encourages Petitioner Green, pleading that he needs the money from the life insurance." (Doc. 2 at 7) Green contends that he could have argued that he lacked predisposition to commit solicitation because he had no prior criminal history related "to the issue at trial." (Doc. 2 at 7)

Green further argues that entrapment was not inconsistent with his defense of lack of intent to commit solicitation. Under Florida law, generally, "one who denies committing the act that constitutes the offense cannot claim entrapment." *Wilson v. State*, 577 So.2d 1300, 1300 (Fla. 1991).[4] An exception may apply, however, to a defendant who maintains that he lacked the requisite intent to commit the offense. *See id*. at 302 ("Asserting the entrapment defense is not necessarily inconsistent with denial of the crime even when it is admitted that the requisite acts occurred, for the defendant might nonetheless claim that he lacked the requisite bad state of mind." (quoting W. LaFave and J. Israel, *Criminal Procedure* § 5.3 at 254-55 (1985))); *see also State v. Rokos*, 771 So.2d 47, 48-49 (Fla. 4th DCA 2000) (noting this exception).

At the postconviction evidentiary hearing, counsel testified that Green asked him about entrapment and that counsel considered entrapment but concluded it was not a viable defense. (Doc. 32 Ex. 28 at 345-47) Counsel determined that evidence about an earlier communication between Green and Bemis regarding killing Ginger, as well as the evidence about the insurance policy and the contentious divorce, would defeat any argument that Green lacked predisposition to commit the crime. (Doc. 32 Ex. 28 at 347-51) Counsel stated that he instead pursued the defense that Green did not intend to commit solicitation because

---

[4] In fact, when the state appellate court reversed the initial denial of Green's claim, the state court determined that, "[b]y [the] definition" of entrapment contained in § 777.201(1), Fla. Stat., "to present an entrapment defense, one would have to admit that he or she committed the crime but did so only because of the actions of law enforcement." *Green*, 34 So.3d at 784.

Green and Bemis were merely playing "What If" and "this was a big joke." (Doc. 32 Ex. 28 at 354-55)

As Green points out, counsel expressed an understanding that admission of the crime is a component of entrapment. (Doc. 32 Ex. 28 at 351) However, counsel further stated that he would not have wanted to assert both lack of intent and entrapment because he did not want to raise "what we call a shotgun defense where you throw it all up on the wall[.]" (Doc. 32 Ex. 28 at 356) Counsel explained that "based on everything Mr. Green had told me, I thought that the most viable defense, based on the evidence, from a strategic standpoint, a tactical standpoint was lack of intent" and reiterated that "I felt the best defense, based on everything we had, was the evidence that we put on, which was lack of intent." (Doc. 32 Ex. 28 at 356-57)

At the evidentiary hearing, Green called attorney Donald Pumphrey as an expert witness in the area of criminal defense trial work. Pumphrey testified that he believed the recording supported an entrapment defense and he saw no reason not to raise entrapment. (Doc. 32 Ex. 28 at 326-27, 329-30)

The state court denied the claim. After recounting the evidentiary hearing testimony, the state court found (Doc. 32 Ex. 28 at 308-10) (state court's record citations omitted) (emphasis in original):

> After reviewing Defendant's claim, the testimony, evidence, and argument presented at the evidentiary hearing, the court file, and the record, the Court finds Defendant has failed to demonstrate deficient performance. *See Strickland*, 466 U.S. at 686-87. To demonstrate deficient performance, Defendant must show counsel's performance "fell outside the range of professionally acceptable performance." *Gonzalez v. State*, 579 So.2d 145 (Fla. 3d DCA 1991) (citing *Strickland*, 466 U.S. at 668). Defendant presented Mr. Pumphrey's testimony in an attempt to show counsel's decision not to present an entrapment defense was deficient. Though Mr. Pumphrey testified entrapment would likely have been a successful defense, the Court finds his opinion – developed with the

benefit of hindsight – does not establish that counsel's performance fell below the *range* of what is considered professionally acceptable. Mr. Pumphrey did not review the depositions or police reports that counsel used to prepare pre-trial nor was he privy to counsel's conversations with Defendant. Mr. Pumphrey reviewed the trial record, giving him the benefit of knowing the exact trial testimony, which is an advantage [counsel] did not have while developing his trial strategy.

Further, [counsel] testified he considered the entrapment defense upon Defendant's request, but based on the evidence and discussions with Defendant, he believed the best defense available was to argue lack of intent to the jury. Therefore, reconstructing the circumstances surrounding [counsel]'s decision not to present the entrapment defense at trial, the Court finds counsel's decisions were reasonable and based on trial strategy. Therefore, the Court finds counsel did not perform deficiently when he chose not to present the entrapment defense at trial. *See Hannon v. State*, 941 So.2d 1109, 1121 (Fla. 2006) (stating that a defendant has not met the first *Strickland* prong if the court finds that counsel's decisions were based on a carefully crafted trial strategy); *Occhicone v. State*, 768 So.2d 1037, 1048 (Fla. 2000) (stating that counsel's strategic decisions do not constitute ineffective assistance if they are reasonable and other alternatives were considered).

Additionally, counsel testified he made a strategic decision not to present the entrapment defense along with arguing lack of intent because it would be tantamount to a "shotgun defense." Instead, as counsel testified, counsel decided to present the one defense he saw as the most viable defense for trial, and the Court finds this is a reasonable strategy. *See Hannon*, 941 So.2d at 1121; *Occhicone v. State*, 768 So.2d at 1048. Moreover, the Court finds it is unlikely counsel could have successfully presented an entrapment defense. Although the Defense argued otherwise, citing *State v. Rokos*, 771 So.2d 47 (Fla. 4th DCA 2000), the Courts finds by definition, the entrapment defense requires the Defendant "to admit that he or she committed the crime but did so only because of the actions of law enforcement." *Green*, 34 So.3d at 784. Therefore, because Defendant never admitted he committed the crime of solicitation to murder in the first degree, counsel could not present a viable entrapment defense. As such, the Court finds Defendant has failed to demonstrate counsel performed deficiently, and Defendant is not entitled to relief on his ineffective assistance of counsel claim. *See Strickland*, 466 U.S. at 686-87.

Green fails to show that the state court unreasonably applied *Strickland* in denying his claim. Green contends that both the postconviction court and counsel misunderstood state law and did not realize that, under the exception addressed in *Wilson* and *Rokos*, counsel could have raised entrapment even if Green did not admit to having committed solicitation. Green

therefore asserts that counsel acted deficiently because his decision was based "on a complete misunderstanding of a clear rule of law." *See Lawhorn v. Allen*, 519 F.3d 1272, 1295 (11th Cir. 2008).

Initially, even assuming the state postconviction court made an error of state law in deciding Green's ineffective assistance claim, such an error cannot be corrected on federal habeas review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[The United States Supreme Court has] repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *Pinkney v. Secretary, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' [a federal court] 'must defer to the state's construction of its own law' when the validity of the claim that appellate counsel failed to raise turns on state law." (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984))).

Moreover, even assuming that the state court or counsel misapprehended state law, Green does not demonstrate, under the AEDPA's doubly deferential standard, that the state court unreasonably determined that counsel made a reasonable strategic decision "to present the one defense he saw as the most viable defense for trial[.]" (Doc. 32 Ex. 28 at 309)

The state court's findings that counsel was credible and that counsel made a strategic decision in choosing a defense are factual findings that are presumed correct. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including the credibility findings, are presumed to be correct[.]"); *DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1273 (11th Cir. 2014) (stating that a question "regarding whether an attorney's decision is 'strategic' or 'tactical' is a question of fact[.]"). The presumption of

correctness afforded to a state court's factual finding is rebuttable by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Green has not rebutted this presumption.

As the decision of which defense to present was strategic, Green must show that the decision was "patently" unreasonable to obtain relief. *See Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (stating that counsel's strategic decision "will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983))); *see also Chandler v. United States*, 218 F.3d 1305, 1314-15 (11th Cir. 2000) ("[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy. . . . [B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.") (internal quotation marks and citation omitted). Green fails to make this showing.

Notably, Green does not contend that counsel's decision to present the lack of intent defense was in itself unreasonable choice; rather, he faults counsel for not additionally presenting entrapment. However, the testimony the state court accepted as credible shows that counsel assessed deploying an entrapment defense and determined that it was not likely to succeed because the evidence did not support the lack of predisposition component. Further, counsel explained he did not want to present a "shotgun" defense and, instead, chose a more pointed approach, focusing on what he perceived to be the strongest defense. Thus, counsel evaluated possible defenses; concluded that entrapment was not viable; and decided to pursue lack of intent, which he believed was the single most compelling defense.

Under these circumstances, Green fails to show that counsel's strategic choice was so patently unreasonable as to constitute deficient performance. *See Mirzayance*, 556 U.S. at 123, 127 ("[The Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success. . . . Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether."); *Chandler*, 218 F.3d at 1319 ("Counsel is not required to present every nonfrivolous defense. . . . Considering the realities of the courtroom, more is not always better. Stacking defenses can hurt a case. Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."); *Johnson v. Alabama*, 256 F.3d 1156, 1181 (11th Cir. 2001) (explaining that, while alternative defenses may be raised, "competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury." (quoting *Harrich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988))).

Green has not shown that the state court's denial of his claim involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. As a result, he is not entitled to relief on Ground One.

**Ground Two**

Green asserts that trial counsel was ineffective in failing to investigate Shawn Patterson, who knew both Green and Bemis, and to call Patterson as a witness at trial. Green contends that Patterson could have testified that Bemis had previously attempted to "set up" other people, including Patterson, by falsely telling police that these people had committed crimes.

The state court conducted an evidentiary hearing on this claim. At the hearing, Green testified that he asked counsel to call Patterson. (Doc. 32 Ex. 21 at 328, 331-32) Green explained that he believed Patterson could testify Bemis had once tried to get Patterson to "go in on" a drug sale with Bemis, and that the recorded conversation was simply the type of joking discussion the three men used to have. (Doc. 32 Ex. 21 at 325-28, 338)

Counsel testified that an investigator interviewed Patterson and prepared a report. (Doc. 32 Ex. 21 at 290) Counsel stated that he and Green reviewed the report. (Doc. 32 Ex. 21 at 291) Counsel testified that, according to the report, Patterson said Green was not a "teller of tall tales," which counsel believed was inconsistent with the defense theory that Green's recorded statements were not sincere. (Doc. 32 Ex. 21 at 292, 309) Counsel further testified that he believed Patterson would be subject to impeachment "in regards to bias or prejudice against the State's case" because Patterson had "issues" with and did not trust Bemis, a critical prosecution witness. (Doc. 32 Ex. 21 at 292) Counsel concluded that Patterson's testimony would be of little value and could potentially harm the defense. (Doc. 32 Ex. 21 at 293, 297) Counsel testified that after advising Green against calling Patterson, he and Green made a joint decision not to call Patterson. (Doc. 32 Ex. 21 at 291, 297)

Following the evidentiary hearing, the state court denied Green's claim (Doc. 32 Ex. 21 at 279-80) (state court's record citations omitted):

> Defendant alleges ineffective assistance of counsel for failure to call a witness, Shawn Patterson.
>
> A review of the transcript from the evidentiary hearing reflects that counsel did have an investigator interview Patterson relating to the Defendant's theory of defense. A further review of the transcript reflects counsel made a strategic decision not to call Patterson because his testimony did not support the theory of defense. Specifically, the transcript reflects that counsel believed the testimony would be harmful as it was in direct opposition from the theory of defense, and further, that the witness could be impeached regarding alleged bias

or prejudice towards the State's key witness. Furthermore, counsel testified that upon discussions with the Defendant regarding the above concerns, Defendant agreed not to call Patterson as a witness.

Based upon this testimony presented at the evidentiary hearing, the Court finds the testimony presented by defense counsel highly credible. *Smith v. State*, 697 So.2d 991, 992 (Fla. 4th DCA 1997) (stating that following an evidentiary hearing the finder of fact can rely upon testimony it finds to be credible). Furthermore, "counsel's strategic decisions will not be second-guessed on collateral attack." *Johnson v. State*, 769 So. 2d 990, 1001 (Fla. 2000). Moreover, "[s]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So.2d 1037, 1048 (Fla. 2000). Therefore, the Court finds that it was counsel's strategic decision not to call Patterson as a witness, and further, that the Defendant agreed with this decision. As such, the Defendant is not entitled to relief[.]

Green does not show that the state court unreasonably rejected his ineffective assistance claim. Green does not rebut, by clear and convincing evidence, the presumption of correctness afforded to the state court's factual findings that counsel was credible, and that counsel made a strategic decision not to call Patterson. *See Rolling*, 438 F.3d at 1301; *DeBruce*, 758 F.3d at 1273; *see also Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (stating that whether to call a witness is the "epitome" of a strategic decision that a court will "seldom, if ever, second guess.").

The testimony that the state court accepted as credible reflected counsel's conclusions that Patterson's testimony was unlikely to help Green and was potentially harmful. Additionally, the state court accepted as credible counsel assertion that he concluded that Patterson's credibility was susceptible to impeachment. Green argues that counsel's strategic decision was not reasonable because counsel did not personally interview Patterson but instead relied on the investigator's report. However, Green has not cited any clearly established federal law holding that an attorney's strategic decision about whether to call a

witness is unreasonable when it is based upon information gathered by an investigator, rather than by the attorney personally.

Moreover, Green only speculates that a personal interview by counsel would have revealed different information that would have prompted counsel to call Patterson. Green presents no evidence of what Patterson would have stated in an interview with counsel. Accordingly, Green's claim is too speculative to warrant federal habeas relief. *See Johnson*, 256 F.3d at 1187 ("Johnson offers only speculation that the missing witness would have been helpful. This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'" (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985))); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim).

Green fails to show that counsel's strategic decision not to call Patterson was patently unreasonable under the circumstances. Because Green has not demonstrated that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief on Ground Two.

**Ground Three**

Green argues that trial counsel was ineffective in failing to introduce the "actual written divorce decree" into evidence at trial. Green contends that it would show that the state court did not order him to cancel the life insurance policy on Ginger. Green asserts that this document would have "helped establish a lack of clear motive" by allowing him to explain that he kept the policy active because "there was no court order requiring its cancellation." (Doc. 2 at 16).

24

The state court summarily denied this claim as conclusory and speculative (Doc. 32

Ex. 20 at 74-75):

> Defendant claims ineffective assistance of counsel for failing to introduce the actual written divorce decree into evidence during trial. Specifically, Defendant claims that the introduction of the divorce decree at trial would have rebutted the State's argument that the Defendant had an obligation to cancel the life insurance policy. However, "mere conclusory allegations are not sufficient to meet a defendant's burden on a motion for postconviction relief." Freeman v. State, 761 So. 2d 1055, 1061 (Fla. 2000), citing Kennedy v. State, 547 So. 2d 912 (Fla. 1989). Moreover, "mere speculation regarding possible error is not enough to satisfy Strickland." Bruno v. State, 807 So. 2d 55, 67 (Fla. 2002). After reviewing ground 3, the Court finds that Defendant's allegations are conclusory. The Court further finds that Defendant is merely speculating that if counsel would have introduced the Final Judgment of Dissolution of Marriage, the outcome of the trial would have been different. As such, no relief is warranted upon ground 3.

Green does not show that the state court unreasonably denied his claim. Green

attached to his postconviction motion a final judgment of dissolution of marriage, filed June

16, 2000. (Doc. 32 Ex. 20 at 70) The judgment, which appears to be a standard form

document, contains no mention of an insurance policy. (Doc. 32 Ex. 20 at 70)

Green stated in his trial testimony, however, that he was ordered to cancel the life

insurance policy. He admitted on cross-examination that the judge handling the divorce

proceedings ordered him to cancel the policy. (Doc. 32 Ex. 31 at 237) Green testified on direct

examination that he was angry and upset at the divorce hearing, that he remembered saying

he was not going to cancel the policy, and that he could not deny saying he was going to

collect on it. (Doc. 32 Ex. 31 at 221-22) Green has not explained how counsel was deficient

in not offering the judgment in an effort to prove a point contrary to Green's testimony. Nor

does Green state why he gave such testimony if he had not been ordered to cancel the policy.

Further, regardless of whether the judge ordered the policy cancelled, the fact remains

that Green chose to keep the policy active after the divorce. That fact is relevant to Green's

motive. Introduction of the divorce judgment would not have prevented the State from arguing that Green's decision to maintain the policy after the divorce indicated Green's serious intent in this case. Indeed, the prosecutor touched on this point in closing argument, only briefly mentioning the order to cancel the policy.[5]

Green fails to show that counsel was ineffective in not moving to introduce the judgment or that there is a reasonable probability of a different outcome absent counsel's omission. Because Green does not demonstrate that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief on Ground Three.

**Grounds Four And Five**

In Ground Four, Green contends that trial counsel was ineffective in failing to object, move for a mistrial, move to strike, or request a curative instruction when the prosecutor elicited inadmissible opinion testimony from Detective Durrance that Green was serious

---

[5] The prosecutor stated (Doc. 32 Ex. 31 at 258-59):

> The only thing [Ginger] asked in her divorce was to have this insurance policy canceled. That's the only thing she wanted. What else isn't a joke? The tape isn't the only thing we have. That insurance policy is no joke and it's in evidence and it really exists. That is no joke. Fifty Thousand Dollars.

> An insurance policy, that's something that two people who are in love, committed to each other, that's something two people get so they can provide for one another's future in the event the unspeakable happens. And they're not married anymore. It's five months after a divorce and he is still paying on an insurance policy that he has been ordered to cancel.

> This is no joke. This is no "What If" game. The joke isn't just on Michael Bemis. He threatened Ginger Green at that divorce proceeding. He says, "I'm not going to cancel that policy. I'm going to collect on it." He said it four or five times and he was angry when he said it. And that happened in June of 2000, months before this October 3 conversation.

during his conversation with Bemis.[6] Green contends that counsel's omissions resulted in a failure to preserve these issues for appeal. In related Ground Five, Green argues that counsel was ineffective when, during cross-examination, counsel emphasized Detective Durrance's opinion that Green was serious.

### A.    Ground Four

Ground Four concerns the direct examination of Detective Durrance. As an initial matter, Green's postconviction motion did not allege that counsel was ineffective in failing to move to strike, request a curative instruction, or preserve issues for direct appeal. (Doc. 32 Ex. 20 at 52-55) Accordingly, Green failed to satisfy the requirement that he exhaust these claims in state court before presenting them in a federal habeas petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.").

Because Green cannot return to state court to present the unexhausted claims in an untimely postconviction motion, *see* Fla. R. Crim. P. 3.850(b), they are procedurally defaulted. *See Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001) ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which

---

[6] Section 90.701, Fla. Stat., addresses opinion testimony of lay witnesses:

> If a witness is not testifying as an expert, the witness's testimony about what he or she perceived may be in the form of inference and opinion when:

> (1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and

> (2) The opinions and inferences do not require special knowledge, skill, experience, or training.

will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."). Green does not argue or establish that either exception applies to excuse the default. Notwithstanding the default, Green is not entitled to relief. He fails to show that counsel was ineffective for the same reasons this Court finds that the state court did not unreasonably reject Green's exhausted claims, addressed below.

Green exhausted the claims that counsel was ineffective in not objecting to inadmissible opinion testimony and in not moving for a mistrial based on such testimony. On direct examination, Detective Durrance described listening to the recorded conversation. The prosecutor asked (Doc. 32 Ex. 30 at 44) (emphasis added):

BY [STATE]:

> Q       Detective Durrance, after you listened to the tape and verified some information, what did you do at that point?

> A       I contacted the State Attorney's Office, Assistant State Attorney Chris Moody. I advised him of the information that I had overheard on that tape.

> [COUNSEL]: Objection, Your Honor.

> Relevance and - - it's relevance right now.

> THE COURT: Overruled.

> THE WITNESS: **And told him I had developed some real concerns for the victim's safety at that time listening to that tape. And I expressed to Chris Moody, who, in turn, also agreed with me and related that he thought - -**

> [COUNSEL]: Objection, Your Honor.

> THE COURT: Sustained.

> THE WITNESS: **I had probable cause for an arrest**.

> [COUNSEL]: Hearsay.

THE COURT: Sustained.

Although the court sustained counsel's hearsay objection, Green asserts that counsel should have objected and moved for a mistrial on the basis that this testimony improperly introduced the opinions of both Detective Durrance and the Assistant State Attorney that Green was serious in his conversation with Bemis. The state court denied Green's ineffective assistance claims (Doc. 32 Ex. 20 at 75-76):

> Defendant claims that trial counsel should have objected and moved for a mistrial based upon the Officer's statements. . . . [T]rial counsel made an appropriate hearsay objection, which was sustained by the Court. Consequently, Defendant has failed to meet the first prong of Strickland in that he has filed to prove that counsel acted deficiently in failing to object. Further, Defendant claims that the Detective should not have been allowed to give his opinion regarding the seriousness of the Defendant's statements when the Detective had not been qualified as an expert. However, "mere conclusory allegations are not sufficient to meet a defendant's burden on a motion for postconviction relief." Freeman v. State, 761 So.2d 1055, 20161 (Fla. 2000) citing Kennedy v. State, 547 So.2d 912 (Fla. 1989). Moreover, "mere speculation regarding possible error is not enough to satisfy Strickland." Bruno v. State, 807 So.2d 55, 67 (Fla. 2002). As such, no relief is warranted upon ground 4.

Green does not show that the state court unreasonably rejected his claims as conclusory and speculative.[7] First, no part of Detective Durrance's testimony states an opinion that Green was serious when he spoke to Bemis. Rather, the opinion contained in the identified testimony is limited to the opinion that there was probable cause for an arrest. Accordingly, Green does not establish that counsel had a valid basis to object to Detective Durrance's testimony as improperly introducing either Detective Durrance's or Assistant

---

[7] To the extent the resolution of Green's claims rests on a determination of whether an objection or a motion for mistrial would have been meritorious under state law standards, this Court must defer to the state court's application of Florida law. See Pinkney, 876 F.3d at 1295.

State Attorney Moody's statement as an inadmissible opinion that Green was serious during the conversation.

Furthermore, even if Detective Durrance's testimony is interpreted as implying an opinion that Green was serious, counsel was not deficient in not challenging the testimony on that basis. Counsel later addressed the issue of whether Detective Durrance took the threat seriously in developing a defense argument. As Green notes in Ground Five, counsel asked Detective Durrance numerous questions on cross-examination that elicited Detective Durrance's testimony that he was worried for Ginger's safety and was concerned that Green might have her killed. (Doc. 32 Ex. 30 at 63-65) While Green asserts that counsel was ineffective in asking such questions, Green does not acknowledge that counsel strategically asked these questions so that he could make further inquiries that revealed Detective Durrance did almost no investigation into the case. This was done to bolster the defense theory that Detective Durrance did not actually believe a real threat existed.

For instance, counsel drew out Detective Durrance's testimony that Green was not arrested for almost a full day after the conversation; that law enforcement did not surveil Green after the conversation; that Detective Durrance waited until the day after the conversation to obtain Ginger's phone number and talk to her; and that Detective Durrance never made contact with Florida Metropolitan University, where Ginger went to school and worked. (Doc. 32 Ex. 30 at 64-66) In addition, counsel elicited Detective Durrance's testimony that he did not corroborate any information provided to law enforcement by Bemis or stated in the recorded conversation (other than the location of Green's residence), despite Detective Durrance's acknowledgment that verification and corroboration are important in any investigation. (Doc. 32 Ex. 30 at 49-52, 54-55)

Considered in context, counsel's cross-examination of Detective Durrance implied that the Detective's lack of investigation and action demonstrated that, at the time, law enforcement did not believe any threat to Ginger to be serious.[8] In addition, counsel's closing argument repeatedly raised law enforcement's failure to watch Green's activities or to attempt to corroborate information. Counsel strenuously argued that the dearth of investigation and law enforcement action—which was thoroughly addressed on cross-examination—created reasonable doubt because it left the State with little evidence other than the words on the recording, which were insufficient to prove Green's guilt. (Doc. 32 Ex. 31 at 249-52, 263-68)

Based on the foregoing, Green has not established that counsel was ineffective in not objecting or moving for a mistrial on the basis that the identified direct examination testimony introduced an improper opinion. Accordingly, Green does not show that the state court's rejection of his claim was based on an unreasonable application of *Strickland* or an unreasonable factual determination. Green is not entitled to relief on Ground Four.

### B.    Ground Five

Green argues that trial counsel was ineffective by emphasizing Detective Durrance's belief that Green was serious in the portions of the cross-examination cited above. Similar to its resolution of the claim presented in Ground Four, the state court denied Green's ineffective assistance claim as conclusory and speculative (Doc. 32 Ex. 21 at 76):

> In ground 5, Defendant claims ineffective assistance of counsel for stressing the officer's opinion that the Defendant was serious about his taped statements. Specifically, Defendant cites to four (4) instances in the record where he claims trial counsel improperly stressed the Detective's opinion that he was concerned for the victim's safety. However, "mere conclusory allegations are not sufficient to meet a defendant's burden on a motion for postconviction relief." Freeman

---

[8] As discussed in Ground Six, counsel testified at the postconviction evidentiary hearing that he believed his cross-examination of Detective Durrance regarding these issues was the strongest point in the trial for the defense.

v. State, 761 So. 2d 1055, 1061 (Fla. 2000), citing Kennedy v. State, 547 So.2d 912 (Fla. 1989). Moreover, "mere speculation regarding possible error is not enough to satisfy Strickland." Bruno v. State, 807 So. 2d 55, 67 (Fla. 2002). After reviewing ground 5, the Court finds that Defendant's allegations are conclusory. The Court further finds that Defendant is merely speculating that if counsel would not have reiterated the Detective's opinion that he was concerned for the victim's safety, the outcome of the trial would have been different. As such, no relief is warranted upon ground 5.

Green has not established that the state court's decision was unreasonable. As addressed, counsel utilized cross-examination to elicit information suggesting that the lack of investigation showed that law enforcement did not think Green was serious. He also sought to create reasonable doubt due to the scarcity of corroborating evidence. Under the circumstances of this case, Green fails to show that the state court's denial of his ineffective assistance claim involved an unreasonable application of *Strickland* or an unreasonable determination of the facts. Green is not entitled to relief on Ground Five.

**Ground Six**

Green claims that trial counsel was ineffective in advising him that he should reject the State's plea offer because he would prevail at trial. "Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). Green states that he raised this claim as ground seven of his state postconviction motion. The state court conducted an evidentiary hearing on this claim.

Green testified that the State made a four-year offer after the first day of trial. (Doc. 32 Ex. 21 at 346)[9] Green testified that while the jury was deliberating, counsel relayed another offer of 18 months, but advised Green not to accept it because the prosecutor only would have

---

[9] At the evidentiary hearing, Green did not testify as to how counsel advised him regarding the four-year offer. (Doc. 32 Ex. 21 at 325-46) Nor did Green specifically explain in his postconviction motion counsel's alleged  failure in providing advice regarding the four-year offer, as the motion centered on an alleged 18-month offer. (Doc. 32 Ex. 20 at 62-64)

made the offer if she thought the State had "lost." (Doc. 32 Ex. 21 at 332-33) Green's mother, Dorothy Phillips, was present for some discussions between Green and counsel. Phillips testified the four-year offer was made after the trial started, that counsel said the State was making the four-year offer because the prosecution thought it might lose, and that Green told her that counsel said "everything was going to be okay." (Doc. 32 Ex. 21 at 317-18)

Counsel testified that the State made a four-year offer prior to jury selection, which he urged Green to accept. (Doc. 32 Ex. 21 at 298-300, 302) Counsel testified that Green was certain that he wanted to proceed to trial. (Doc. 32 Ex. 21 at 300-01) Counsel explained that he repeatedly discussed the offer with Green, but "[t]here comes a point where this was his decision, and I respected his decision to go to trial, and we were going to trial." (Doc. 32 Ex. 21 at 300-01) Counsel testified that the State never made an offer of 18 months. (Doc. 32 Ex. 21 at 301)

Counsel recalled that, after he cross-examined Detective Durrance, he asked Green for permission to make the State a counteroffer of 18 months or a year and a day because counsel believed the cross-examination went well. (Doc. 32 Ex. 21 at 306-308) Counsel testified, however, that Green "would have none of it" and that there were no further plea negotiations. (Doc. 32 Ex. 21 at 308-09) Counsel testified that he "absolutely" never assured or promised Green that Green did not need to accept any offer because he would win. (Doc. 32 Ex. 21 at 301)

The state court denied Green's claim. After summarizing the evidentiary hearing testimony, the state court found (Doc. 32 Ex. 21 at 281):

> Based upon this testimony presented at the evidentiary hearing, the Court finds the testimony presented by defense counsel to be highly credible. Smith v. State, 697 So.2d 991, 992 (Fla. 4th DCA 1997) (stating that following an evidentiary hearing the finder of fact can rely upon testimony it finds to be credible).

Furthermore, "counsel's strategic decisions will not be second-guessed on collateral attack." <u>Johnson v. State</u>, 769 So.2d 990, 1001 (Fla. 2000). Moreover, "[s]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." <u>Occhicone v. State</u>, 768 So.2d 1037, 1048 (Fla. 2000). The Court finds that counsel related the four (4) year plea offer to the Defendant, but the Defendant insisted on proceeding to trial. The Court further finds that the Defendant was never offered an eighteen (18) month plea offer. Therefore, the Defendant has failed to show that counsel's performance was deficient or that he was prejudiced. As such, the Defendant is not entitled to relief on ground two of his Motion for Postconviction Relief.

Green now argues that the state court's credibility finding was unreasonable. Green maintains that counsel, contrary to his evidentiary hearing testimony, advised Green to reject the State's offer and to proceed with trial. Green contends that counsel's evidentiary hearing testimony shows that counsel "was feeling confident" about the case and that in such a circumstance, "a defense attorney might be tempted to ask his client for the freedom to win the case outright because the State's case was crumbling." (Doc. 2 at 27) Green asks this Court "to look beyond defense counsel's convenient assertions" and find that the state court unreasonably determined counsel's credibility. (Doc. 2 at 28) In support of his belief that counsel was confident about the outcome, Green cites the portion of counsel's evidentiary hearing testimony explaining counsel's belief that the cross-examination of Detective Durrance was a strong point in the trial for the defense.

Green fails to come forward with clear and convincing evidence to rebut the presumption of correctness afforded to the state court's finding that counsel's testimony was credible. Green simply speculates about the veracity of the very same testimony the state court heard and considered. This speculation is insufficient to show entitlement to relief. *See Consalvo v. Sec'y, Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("Federal courts have 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state

34

trial court, but not by them.' . . . We consider questions about the credibility and demeanor

of a witness to be questions of fact." (quoting *Marshall v. Lonberger*, 459 U.S. 422 (1983))).

Further, this Court notes counsel's evidentiary hearing testimony, considered in context,

simply set out why he thought the defense should make a counteroffer during the trial (Doc.

32 Ex. 21 at 307-08):

> So one of the strengths of our case . . . it was, "Okay, Detective, you had the
> opportunity to corroborate, and instead of just taking what's coming out of his
> mouth, we can watch what he does as opposed to what he says, and we can
> see, did you go get the work schedule? Did you follow him to see if he got the
> work schedule? Did you follow him to see if he got the gun? Did you follow
> him to - - did you do anything to corroborate factually, by his conduct, the
> things that were coming out of his mouth?" And the Detective just kept saying,
> "No, no." And I got him to say it, I don't know, ten times or something in front
> of the jury, and basically I was wanting to paint the picture for the jury that
> they could have done one thing to corroborate, and they didn't do anything.
> And it was a very positive moment for us in the trial, and I came back to David
> and I said, "David, this is it, this is the best this case is ever going to get. You've
> got to let me move, you know, take the cuffs off, let me go over there and let me
> give them an offer," you know, eighteen months, a year and a day, give me
> anything. And I - - you know, I don't want to say I begged him, but it was like,
> "Give me something to walk over there with," because the victim in cases like
> that is always in a position where security and safety is important. So the
> security of the plea, the security of a prison sentence, no appeal, and they got a
> year and a day or eighteen months to move to Kansas and start a new life. And
> that's the pitch that I was going to make to the prosecutor at the time, was,
> "Hey, this is a done deal, it's all locked up. She's got time. He's going to be in
> prison for a while. We both get a little something of what we want, and let's go
> home." And I begged David to let me make that offer, and he would - - he
> would have none of it. He just - - he thought his case was great and that we
> were doing awesome, and he just thought he was - - I guess he thought we were
> going to win.

The testimony the state court accepted as credible reveals that counsel never advised

Green not to take a plea offer because he would assuredly succeed at trial; that the State never

presented an 18-month offer to Green; and that Green decided not to accept the State's four-

year offer despite counsel's advice that he should do so. As counsel advised Green to accept

the four-year plea offer—the best offer the State extended to Green—there was no failure of advice concerning acceptance of the offer.

Green fails to meet his burden of showing that the state court unreasonably applied *Strickland* or unreasonably determined the facts when it denied his claim. Green is not entitled to relief on Ground Six.

**Ground Seven**

Green argues that he is entitled to relief based on the cumulative effect of trial counsel's alleged errors. The state court denied Green's cumulative error claim on the grounds that it did not find counsel ineffective for any of the reasons presented in the postconviction motion. (Doc. 32 Ex. 21 at 356) The state court did not unreasonably deny Green's claim.  As Green fails to show that his trial counsel was ineffective on any of the bases presented in his petition, his claim of cumulative error necessarily fails. *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (stating that when none of the individual claims of error have merit, "we have nothing to accumulate."); *United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful errors, there can be no cumulative effect compelling reversal."). Green does not show that the state court's rejection of his cumulative error claim was contrary to or involved an unreasonable application of clearly established federal law. Consequently, he is not entitled to relief on Ground Seven.

**Ground Eight**

Green asserts that the trial court violated his Sixth Amendment right to confrontation by limiting his cross-examination of Jesse Varnedoe. Varnedoe was the life insurance agent who sold Green the insurance policy on Ginger. Varnedoe testified about Green's purchase of the policy. (Doc. 32 Ex. 31 at 198-203) Varnedoe explained that Green used to work at the

same insurance company as Varnedoe, but he did not know Green while Green was employed there. (Doc. 32 Ex. 31 at 201)

During the recorded conversation, Bemis and Green discussed whether Green had a life insurance policy on Bemis (Doc. 32 Ex. 30 at 84-85):

MR. BEMIS: [ ] You still go that policy on me?

MR. GREEN: No, I don't think so.

MR. BEMIS: You don't think so?

MR. GREEN: Uh-uh.

MR. BEMIS: I'm worried that I did the job, instead of giving me my twenty-five grand, you just off my ass. Then you'll have two policies.

MR. GREEN: Yeah, there you go.

MR. BEMIS: (Laughing) I've been wondering about that.

MR. GREEN: No, I don't have - - I don't have that anymore. The only three I've got is mine, [Green's daughter's], and Cathy's, hers.

Green testified at trial that he never owned a policy on Bemis, but that in jest, "somewhere during the course of time I probably told him, you know, I got an insurance policy on him, too." (Doc. 32 Ex. 31 at 229) Green wanted to elicit Varnedoe's testimony that Varnedoe did not know of Bemis and did not know Green to have purchased a policy on Bemis. Green argued to the trial court such testimony would show that Green did not, in fact, own a policy on Bemis. The trial court sustained the prosecution's objection to the testimony as beyond the scope of direct examination. (Doc. 32 Ex. 31 at 204)[10]

---

[10] Green proffered Varnedoe's testimony (Doc. 32 Ex. 31 at 281-82):

Q. Okay. You have known David Green personally for how long?

A. Two and a half, three years.

In this federal habeas petition, Green appears to argue that Varnedoe's testimony would have suggested that Green was joking about having an insurance policy on Bemis, thereby implying that Green was also joking about soliciting the murder of Ginger. Green fails to show entitlement to relief.

This claim is unexhausted because Green did not alert the state appellate court to the federal nature of the claim on direct appeal. (Doc. 12 Ex. 2 at 35-39) Green did not identify the claim as federal, assert the violation of a federal constitutional right, or cite any federal authority. (Doc. 12 Ex. 2 at 35-39) *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."). Green cannot return to state court to exhaust the federal claim because

---

Q. You have talked to him on more than one occasion?

A. I have.

Q. All right. Until last week, when I called you to discuss your anticipated testimony, have you ever heard the name Michael Bemis?

A. I have not.

Q. Did you ever review your records and the records of the company to determine whether David Green ever owned a policy on Michael Bemis?

A. I reviewed them. I did not find anything.

Q. So, to your knowledge, based on all the records available through your company, David Green never had an insurance policy on Michael Bemis's life, in which Michael Bemis was insured and David Green was the beneficiary?

A. Not to my knowledge.

Q. So that would be correct?

A. That's correct.

state procedural rules do not provide for second direct appeals. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of rendition of the sentence). Accordingly, the claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Green does not argue or establish that an exception applies to overcome the default. *See id*.

Notwithstanding the default, Green fails to show entitlement to relief. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)) (emphasis in original). Thus, a Confrontation Clause violation occurs when a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness[.]" *Id*. at 680. In other words, a defendant's Sixth Amendment right to confrontation is protected if he is able to cross-examine a witness so as to impeach the witness's credibility. *See United States v. Barrington*, 648 F.3d 1178, 1188 (11th Cir. 2011) ("The Sixth Amendment is satisfied so long as a defendant is permitted cross-examination which 'exposes the jury to facts sufficient to evaluate the credibility of the witness and enables defense counsel to establish a record from which he properly can argue why the witness is less than reliable.'" (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1371 (11th Cir. 1994))); *United States v. Maxwell*, 579 F.3d 1282, 1296 (11th Cir. 2009) ("[T]he test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." (quoting *United States v. Garcia*, 13 F.3d 1464, 1469 (11th Cir. 1994))).

The limitation on Varnedoe's cross-examination did not interfere with Green's ability to ask questions that would have gone to Varnedoe's credibility or bias. Rather, the proposed questioning only went to Varnedoe's factual knowledge of a collateral matter: whether Green had ever purchased an insurance policy on Bemis. Therefore, Green fails to show any constitutional violation in the trial court's limitation on his cross-examination of Varnedoe. Accordingly, Green is not entitled to relief on Ground Eight.

**Evidentiary Hearing**

Within Grounds Three, Four, and Five, Green appears to argue that the state court erred in summarily denying his ineffective assistance claims without an evidentiary hearing. Green's argument is not cognizable on federal habeas review. *See Carroll*, 574 F.3d at 1365 ("[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment—*i.e.*, the conviction itself—and thus habeas relief is not an appropriate remedy."); *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."). To the extent Green seeks an evidentiary hearing on any claim presented in his federal habeas petition, the Court finds that an evidentiary hearing is not warranted. *See Schriro*, 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

It is therefore **ORDERED** that Green's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Green and to **CLOSE** this case.

## CERTIFICATE OF APPEALABILITY
## AND
## LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

**IT IS FURTHER ORDERED** that Green is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a court must first issue a certificate of appealability. Section 2253(c)(2) limits the issuing of a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a certificate of appealability, Green must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001). Because he fails to make this showing, Green is not entitled to a certificate of appealability. Therefore, he is not entitled to appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**. Leave to proceed *in forma pauperis* on appeal is **DENIED**. Green must obtain permission from the circuit court to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on this 18th day of February, 2021.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE